Filed 05/29/26

VERMONT SUPERIOR COURT
Washington Unit
65 State Street
Montpelier VT 05602
802-828-2091
www.vermontjudiciary.org



CIVIL DIVISION
Case No. 25-CV-05690

---

**Michael Ferland v. Christ the King Parish in Rutland, et al**

---

## ENTRY REGARDING MOTION

Title: Motion to Dismiss (Motion: 2)
Filer: Kaveh S. Shahi
Filed Date: January 20, 2026

Defendants' motion to dismiss is **granted in part** and **denied in part**. Defendants' request for judicial notice is **denied**. The present matter is **stayed.**

Plaintiff Michael Ferland claims that a Roman Catholic priest, Father Edward Paquette, repeatedly sexually abused him when Mr. Ferland was a child-parishioner and altar boy at St. Augustine Parish in Montpelier (St. Augustine) and a student at St. Michael's Elementary School, both in Montpelier. Fr. Paquette was assistant pastor at St. Augustine from 1974 to 1976, when the abuse is alleged to have occurred. In this case, Mr. Ferland seeks to establish liability for that sexual abuse against named Defendants St. Augustine, St. Augustine Parish Charitable Trust, Christ the King Parish in Rutland (Christ the King), and Christ the King Parish Charitable Trust. The legal claims are framed in the complaint as (1) negligent and grossly negligent supervision against all defendants; (2) breach of fiduciary duty as to both St. Augustine defendants; (3) negligent and grossly negligent failure to prevent harm as to all defendants; and (4) premises liability as to both St. Augustine defendants.[1] Defendants have filed a motion to dismiss addressing all claims against both the Trust defendants and the Parish defendants.

As a preliminary matter, the court clarifies that, while Defendants' motion to dismiss is framed under both Rule 12(b)(1), lack of subject matter jurisdiction, and Rule 12(b)(6), failure to state a claim, only Rule 12(b)(6) applies. Defendants argue that the court lacks subject matter jurisdiction over the claims asserted against the Trust defendants, and they otherwise seek

---

[1] Under 12 V.S.A. § 522(d), "In an action based on childhood sexual abuse that would have been barred by any statute of limitations in effect on June 30, 2019, damages may be awarded against an entity that employed, supervised, or had responsibility for the person allegedly committing the sexual abuse only if there is a finding of gross negligence on the part of the entity." Mr. Ferland alleges, "Prior to 2019, Plaintiff had not yet discovered that the injuries and conditions as to which he complains herein were caused by the sexual abuse set out in this Complaint and that Defendants were responsible for his injuries and conditions." Complaint ¶ 36.

1

dismissal for failure to state a claim. Nominally, the argument framed as touching on the court's subject matter jurisdiction uses the language of ripeness, case and controversy, justiciability, and standing. In substance, however, the argument is that the Trusts cannot be held liable for the pleaded torts that were complete long before the Trusts ever came into existence, and to the extent that they are named as parties due to some perception of a fraudulent conveyance, no such claim has been pleaded. In other words, any cause of action against the Trusts necessarily cannot be meritorious based on the allegations of the complaint.

"'Subject matter jurisdiction' refers to the power of a court to hear and determine a general class or category of cases." *Lamell Lumber Corp. v. Newstress Int'l, Inc.*, 2007 VT 83, ¶ 6, 182 Vt. 282. "[I]t is well settled that the failure to state a proper cause of action calls for a judgment on the merits and not for a dismissal for want of jurisdiction." *Bell v. Hood*, 327 U.S. 678, 682 (1946); see also *Vermont Hum. Rts. Comm'n v. Town of St. Johnsbury*, 2024 VT 71, ¶ 13, 220 Vt. 214 ("Subject-matter jurisdiction 'refers to a tribunal's power to hear a case,' not to 'whether the allegations the plaintiff makes entitle him to relief.'"); *State v. Washburn*, 2024 VT 45, ¶ 11, 219 Vt. 552 ("A court's subject matter jurisdiction 'is a concept easy to confuse with the simple authority to act.'"). Defendants' dismissal argument as to the Trusts is most sensibly characterized as seeking dismissal for failure to state a claim. They do not contend that the court lacks the power in this case to make that determination. Accordingly, the court sees no defect in its subject matter jurisdiction. The question presented by Defendants' motion to dismiss, as to the Trust defendants and the Parish defendants, is whether Mr. Ferland has stated a claim under Rule 12(b)(6).

I.      *Procedural standard*

The Vermont Supreme Court has described the familiar standard for Rule 12(b)(6) motions to dismiss for failure to state a claim as follows:

> "A motion to dismiss . . . is not favored and rarely granted." This is especially true "when the asserted theory of liability is novel or extreme," as such cases "should be explored in the light of facts as developed by the evidence, and, generally, not dismissed before trial because of the mere novelty of the allegations." In reviewing a motion to dismiss, we consider whether, taking all of the nonmoving party's factual allegations as true, "'it appears beyond doubt' that there exist no facts or circumstances that would entitle the plaintiff to relief." We treat all reasonable inferences from the complaint as true, and we assume that the movant's contravening assertions are false.

2

*Alger v. Dep't of Labor & Indus.*, 2006 VT 115, ¶ 12, 181 Vt. 309 (citations omitted); see also 5B A. BENJAMIN SPENCER, ET AL., FED. PRAC. & PROC. CIV. § 1357 (4th ed.) ("Ultimately, the burden is on the moving party to prove that no legally cognizable claim for relief exists.").

Apart from the allegations of the complaint, in considering dismissal, Defendants request (by filing on Jan. 20, 2026) that the court take judicial notice, over Mr. Ferland's objection, of two clergy sex abuse complaints filed against the Roman Catholic Diocese of Burlington, Vermont, Inc., in 2009 and 2010, as well as Code of Canon Law, Can. 515, § 1. For his part, in opposition to dismissal, Mr. Ferland relies on and has provided a copy of the 213-page Parish Finance & Administrative Manual (2013), which otherwise is not part of the dismissal record. Defendants' request to take judicial is denied, and the court will disregard the Manual for present purposes as both go beyond the state of the pleadings and seek to convert a motion to dismiss into a motion for summary judgment on these issues. Regardless of their propriety, none of the proffered extra-record evidence aids the court's analysis under Rule 12(b)(6), which will be limited to the four corners of the complaint.

## II.      *The basic facts alleged in the complaint*

St. Augustine and Christ the King fall within the Roman Catholic Diocese of Burlington, Vermont, which covers the entire state. The head of the Diocese is its bishop. Before Fr. Paquette was transferred in 1974 to Montpelier's St. Augustine, he served at Rutland's Christ the King. While at Christ the King, it became known that he was sexually abusing boys. His misconduct was concealed by officials within the Diocese, and he was quietly transferred by the Diocese to St. Augustine, where his misconduct continued. It was there that Mr. Ferland became one of Fr. Paquette's child-victims. No one from Christ the King warned anyone at St. Augustine. St. Augustine's officials subsequently became aware that Fr. Paquette was abusing boys in Montpelier, witnessing it directly, but they took no steps to remove him or prevent him from having contact with boys in the parish.

Prior to 2006, title to all real property related to St. Augustine and Christ the King, was held in the name of the Burlington Diocese. In 2006, the Diocese created two express trusts: St. Augustine Parish Charitable Trust and Christ the King Parish Charitable Trust. The Diocese then deeded into those Trusts all real property, held by the Diocese, related to each respective Parish. The Diocese's presiding bishop, in his official capacity, is and has always been the

trustee of the Trusts.[2] According to Mr. Ferland's complaint, the Diocese created the Trusts in an improper effort to shield Diocese property from Diocese creditors related to the myriad, accumulating clergy sex abuse liabilities. More recently, in or around 2025, those liabilities drove the Diocese into bankruptcy which, according to the parties, remains pending.

The thrust of the complaint is that the Parish defendants are "unincorporated associations," evidently with separateness—in a secular, legal sense—from the Diocese of which they otherwise are a part for liability purposes here, and that they (the Parishes) were responsible for hiring, supervising, transferring, and suspending or terminating Fr. Paquette, the underlying conduct upon which the tort claims of this case are based.[3] Mr. Ferland is not asserting mere vicarious liability against the Parishes as Fr. Paquette's employers.[4] Rather, all asserted torts represent direct claims of affirmative wrongdoing by the Parishes.

---

[2] One presumes that the respective Parishes are the beneficiaries of the Trusts, but the complaint does not expressly say.

[3] In their briefing, the parties spar about the potential implications of the Parishes' alleged status as "unincorporated associations." Defendants argue, if liability is established against the parishes, then under 12 V.S.A. § 5060, as interpreted by the Supreme Court in *Daniels v. Elks Club of Hartford*, 2012 VT 55, 192 Vt. 114, the layperson parishioners of each Parish would have ultimate and individual responsibility to satisfy any liability if the association's assets prove insufficient. Mr. Ferland contends to the contrary that individual parishioner liability would be limited to only those who actively engaged in the tortious conduct or were officers and directors of each Parish (although it is unclear during what periods such liability would apply). Mr. Ferland's counterargument is similar to the opposing view, urged by the dissent in *Daniels*, which was squarely rejected by the majority. See *Daniels*, 2012 VT 55, at ¶¶ 46–49.

To the extent (and without now deciding) that the Parishes might be properly characterized as the sort of unincorporated associations contemplated in 12 V.S.A. § 5060 and *Daniels*, those authorities would appear to counsel in favor of layperson parishioner liability. A pure application of *Daniels* in this case, however, raises two immediate questions. First, it creates a question of whether current members should be held individually liable for the actions of members from 50 years ago or whether some equitable limiting principle should apply. Second, liability in this situation would arise solely from religious affiliation. This in turn raises First Amendment issues involving Free Association and Free Exercise issues. See, e.g., *Juhl v. Airington*, 936 S.W.2d 640, 642 (Tex. 1996) (curtailing unincorporated association liability that infringed on the right of free association) (citing *NAACP v. Clairborne Hardware*, 458 U.S. 886, 931–32 (1982)). While Defendants have raised some of these issues in their preliminary filings, the issues have not been fully briefed. To the extent that they are relevant to the ultimate resolution of the matter, the Court finds it is premature at the pleading stage to resolve these issues on the present record. Given further that Defendants' motion to dismiss does not hinge on this issue, the Court declines to address these issues at this time. Nevertheless, they pose complicated and serious concerns that will have to be addressed before this litigation can proceed to any type of merits determination.

[4] In Vermont, a church and its members generally will not have purely vicarious liability for claims of sex abuse by its clergy. See *Doe v. Newbury Bible Church*, 2007 VT 72, ¶ 9, 182 Vt. 174 ("Vicarious liability merely penalizes innocent church members for conduct in which they took no part, of which they had no knowledge, and from which they gained no benefit."). It is unclear what, if any, implications *Doe* may have on the proper application of 12 V.S.A. § 5060 and *Daniels* in the circumstances of this case.

4

## III.    *The Trust Defendants*

The Trust instruments are not in the record, but the complaint is clear that they were created in 2006 to attempt to shield Diocese assets from Diocese creditors. There is no allegation that they were created to shield Parish assets from Parish creditors. Defendants focus on the timing of their creation, 2006, in relation to the asserted tortious conduct—the early to mid-1970s—to argue that the Trusts could not possibly have engaged affirmatively in tortious conduct decades before they came into existence, and thus they can have no liability here—but the problem runs deeper.

Without explanation, Mr. Ferland treats the Trusts as though they are legal persons capable engaging in the pleaded torts and of being sued as such for having done so. Trusts, however, unlike corporations or other business entities, are not individuals against whom a claim can be levied. *Raymond Loubier Irrevocable Trust v. Loubier*, 858 F.3d 719, 729 (2d Cir. 2017) (noting that a traditional common law trust "establishes only a fiduciary relationship and that cannot sue or be sued in its own right."). As the Restatement notes, a trust is "a fiduciary relationship with respect to property, arising from a manifestation of intention to create that relationship and subjecting the person who holds title to the property [presumably the current Diocese bishop in this case] to duties to deal with it for the benefit of charity or for one or more persons, at least one of whom is not the sole trustee." Restatement (Third) of Trusts § 2; see also Bogert's The Law of Trusts and Trustees § 1 ("A trust may be defined as a fiduciary relationship in which one person holds a property interest, subject to an equitable obligation to keep or use that interest for the benefit of another."); *N. Sec. Ins. Co. v. Doherty*, 2009 VT 27, ¶ 10, 186 Vt. 598 ("[A]t common law, trusts are not independent legal entities with the capacity to sue or be sued.").

Mr. Ferland nowhere explains how these fiduciary relationships could have hired, supervised, or transferred anyone, or suspended or terminated anyone's employment, much less how they could have done any of that decades before they existed. Mr. Ferland's claims are asserted against the Trusts, not the trustee of the Trusts (whether based on the administration of the Trusts or anything else), and the trustee is the Diocese's bishop, in his official capacity, who is not a party to this case and who is not alleged to be an agent of any kind of either Parish.

In briefing, Mr. Ferland argues that the Trusts are a product of fraud and were designed to hide assets from creditors, which would seem to reveal the real intention behind naming them as

5

parties. In the complaint, however, there is no such claim. Moreover, Mr. Ferland is clear that the Trusts were created by the Diocese to shield Diocese property from Diocese creditors. Presuming the legal separateness of the unincorporated Parishes on which the complaint is predicated, it is altogether unclear what the Diocese's alleged fraud might have to do with the Parishes, who are neither settlors nor trustees. In any event, if there is some question as to whether Diocese creditors can reach the assets of the Trusts, that presumably is a matter to be resolved in the Diocese's bankruptcy case—not here.[5] To the extent that Mr. Ferland means that, one way or another, there are assets in the Trusts that he thinks he should be able to reach to satisfy any Parish liability that he might establish in this case, that is an entirely different matter from claiming that the Trusts somehow are legal persons with direct liability as tortfeasors responsible for the harm caused by Fr. Paquette's behavior, and this reasoning does not give him standing to bring a claim against the trusts, merely because they hold title to an asset that he believes is attachable either through the Diocese's liability or the Parishes'.

For these reasons, Defendants' motion to dismiss is **Granted** as to the Trusts to the extent that they have been named as parties to this case. The court offers no opinion at this time as to whether any assets in the Trusts could be available to satisfy any liability established by Mr. Ferland against the Parishes.

IV. *The Parish Defendants*

As to the Parish defendants, their principal argument is straightforward. The Catholic church operates in a hierarchical manner, and the Roman Catholic Diocese of Burlington, Vermont exercised all employment and related authorities involved in any way that could possibly have led to tort liability related to the misconduct of Fr. Paquette, while the various Parishes never had any such authority. The obvious problem with this argument is that it runs directly contrary to the allegations of the complaint and the Rule 12(b)(6) dismissal standard.[6]

The Parishes argue that the Court should disregard the contrary allegations of the complaint as impermissibly conclusory. They otherwise argue, in effect, that the hierarchical nature of the Diocese's operations is well known, and is reflected in *Turner v. Roman Catholic Diocese of Burlington, Vermont*, 2009 VT 101, ¶ 62, 186 Vt. 396 ("We understand that the

---

[5] Neither the Diocese nor the trustee of the Trusts (the Diocese's bishop) is a party to this case, and any such claim here presumably would be subject to the bankruptcy stay.

[6] It is also asserted in the argument of counsel only as opposed to record evidence.

diocese is hierarchical, with the bishop appointed by Roman Catholic Church hierarchy and not the members of the diocese or a parish. Similarly, the evidence here shows that the diocese employed [the sexually abusive priest].”). Defendants would have the court disregard the allegations of the complaint and rely instead on their counsel's factual representations and the general thrust of other cases in which the named parties here were uninvolved.

No doubt, the Parishes’ allegations are generally consistent with *Turner* and the thrust of much of the relevant academic literature. See generally, e.g., Marie T. Reilly, *Catholic Dioceses in Bankruptcy*, 49 Seton Hall L. Rev. 871 (2019); Theresa J. Pulley Radwan, *Keeping the Faith: the Rights of Parishioners in Church Reorganizations*, 82 Wash. L. Rev. 75 (2007); Stephen M. Bainbridge and Aaron H. Coled, *The Bishop's Alter Ego: Enterprise Liability and the Catholic Priest Sex Abuse Scandal*, 46 J. Cath. Legal Stud. 65 (2007); *"Leap of Faith" into Bankruptcy: an Examination of the Issues Surrounding the Valuation of Catholic Diocese's Bankruptcy Estate*, 13 Am. Bankr. Inst. L. Rev. 839 (2005).[7] And if proven, such facts may well demonstrate that most or all the claims of the complaint lack merit.

But the issue is primarily a factual one in this case, and Mr. Ferland's allegations are what they are. While many of those allegations are conclusory, disregarding them as such would not open the door under the applicable dismissal standard to the Parishes’ contrary allegations. More likely, it might support a request for a more definite statement of Mr. Ferland's claims, yet that still would not allow consideration of the Parishes’ allegations under Rule 12(b)(6). In reality, it is highly likely that the parties are well aware of the universe of available evidence, and the substantial disputes in this case relate to how that evidence will be marshalled and what its legal implications will be. These are not the sort of circumstances in which a more definite statement has any utility.

---

[7] This observation about Catholic hierarchy goes well beyond academic literature and into longstanding popular culture concepts of the Church. The author J.F. Powers wryly borrowed an observation that the Catholic Church was “Second Only to Standard Oil” in organization to animate the thinking of his priest-protagonist in his National Book Award-winning novel. J.F. POWERS, MORTE D’URBAN 118 (1962) (“For the life of him, Father Urban couldn't see how the Catholic Church (among large corporations) could be rated second only to Standard Oil in efficiency as *Time* had reported a few years back.”). Notwithstanding their saturation, the Court cannot simply take judicial notice of these general perceptions without permitting Plaintiff the opportunity in the first instance to make his case in the particular. *Lamb v. Geovjian*, 165 Vt. 375, 379–80 (1996) (noting that res judicata only bars parties from making a claim or defense if there is a final judgment in prior litigation in which “parties, subject matter and causes of action are identical or substantially identical”) (quoting *Berlin Convalescent Ctr., Inc. v. Stoneman*, 159 Vt. 53, 56 (1992)). In this case, the Parishes have shown that this issue of hierarchy and organization has been referenced but not necessarily litigated to a final judgment.

The Court explained in *Colby v. Umbrella, Inc.*, 2008 VT 20, ¶ 14, 184 Vt. 1, that a party should not attempt to "force a merits determination in the early stages of litigation . . . [using] the wrong procedural vehicle." Rather, if, as here, the argument is that the evidence will not support the claims being asserted, a party may seek summary judgment in the early stages "after conducting limited discovery" to ensure that such a motion can be supported with developed evidence and will not be subject to a prematurity objection. *Id.*; see also 10A Fed. Prac. & Proc. Civ. § 2718 (4th ed.) ("[E]ven though the rule itself does not specify a time before which a summary-judgment motion cannot be made by a defending party, there may be circumstances in which a very early motion may be deemed premature because the issues need further development."). As the *Colby* Court explained, the court has ample authority under V.R.C.P. 26(f) to place limitations on discovery to facilitate such a motion in the early stages of the case. Accordingly, if the Parishes wish to seek summary judgment sooner rather than later, the parties may stipulate to whatever limited discovery may be needed prior to any such motion or, barring such a stipulation, the Parishes are free to request a Rule 26(f) discovery conference to facilitate that motion.

Otherwise, the Parishes' motion to dismiss is **Denied** as to the claims against them.

## V.     *Next Steps*

Notwithstanding this analysis, the Court takes note of several factors that are apparent in the complaint and parties' briefing that complicate this case moving forward in a traditional manner.

First, as Plaintiff admits, there is a primary unresolved issue concerning the 2006 transfer of assets and creation of the Parish Trusts. This is a fact-specific issue that may only be resolved with the Diocese and Bishop as necessary parties. See, e.g., *Committee of Tort Litigants v. Catholic Diocese of Spokane*, 364 B.R. 81, 94 (E.D. Wash. 2006) (assigning ownership of properties between Diocese and parishes is a factual determination involving how the properties were purchased, constructed, and maintained); *In re Roman Catholic Church of Archdiocese of Santa Fe*, 621 B.R. 502, 512–13 (Bnkcy. D. N.M. 2020) (noting that this determination is a fact specific review). Despite Plaintiff's argument for liability on the Parish-level, their complaint and briefing is replete with allegations that the properties were improperly transferred from the Diocese to the Parishes in 2006, and that the present action is premised, in part, on the concern that if the Diocese is purged of liability through a bankruptcy injunction, then Plaintiff may not

8

be able to challenge these actions.[8] If this is, in fact, true, then the issue should be resolved by the Bankruptcy Court where the Diocese presently has an active bankruptcy case pending and for which it is entitled to a stay in all state court proceedings.

Second, even if Plaintiff were obligated to accept the 2006 transfers as legitimate, there is a question of whether the trustee, who holds ownership to the assets, against which Plaintiff expressly seeks to recover against, can be haled into state court at this time. The current trustee is the Bishop of the Diocese of Burlington in his official capacity. Given that the Bishop, by virtue of his office, is also involved in the pending bankruptcy, there is an open question as to whether he can, in light of the bankruptcy, be involved in the present matter.

Third, there is a question, as noted above, of hierarchy and organization in the present litigation that underpins Plaintiff's claims. Before this Court can examine the factual issues of liability, it will have to make determinations regarding the authority and structure of both the parishes and the diocese. This is a factual inquiry, and it is likely to involve both the Diocese and the church autonomy doctrine as it will necessarily explore the allocation of authority between parishes and their diocese. *Turner*, 2009 VT 101, at ¶ 33, 186 Vt. at 416. This doctrine "bars courts from becoming too closely involved in the internal, ecclesiastical matters of religious institutions." *Id.*

While this doctrine has secular limits, it has been applied in situations where there are questions about internal church organization practices, discovery of such information, and the qualifications and roles of individuals within the organization. See, e.g., *Bryce v. Episcopal Church in the Diocese of Colorado*, 289 F.3d 648, 656–57 (10th Cir. 2002). Unlike prior abuse cases that sought to hold the Diocese and its leadership responsible, the present action seeks determinations by this Court about the extent and power that individuals within the parish structure had in overseeing priests assigned to them. This necessarily involves the Court in reviewing and considering the internal organization of the Catholic Church in general and the Diocese of Burlington and each parish, in particular. At a minimum, this is likely to involve subpoenas of Diocese records and testimony by Diocese officials. Given that these activities are

---

[8] The Court will note that such issues are not without precedent or history and that fraudulent conveyance actions and derivative standing in bankruptcy are designed for precisely such issues. See, e.g., *Official Committee of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548, 566–68 (3d Cir. 2003) (describing the purpose of derivative standing under the Bankruptcy Code); *In re Roman Catholic Diocese of Rockville Centre, New York*, 654 B.R. 212 (Bnkcy S.D.N.Y. 2023) (noting that the Second Circuit has extended standing to creditors to bring fraudulent conveyance claims under Section 548 and 549 of the Bankruptcy Code).

likely to involve the Diocese and its liability, the Court finds it probable that it will involve the jurisdiction of the Bankruptcy Court and its blanket stay over the Diocese and its officials.

Fourth, there are the concerns noted above in footnote 3 regarding the implications of deeming the Parishes unincorporated associations and the consequences of doing so. At the very least, this issue promises to break new ground in how Vermont courts apply 12 V.S.A. § 5060 and the precedent of *Daniels*. If, in fact, the entire action is intended only to force the Parishes to put assets on the table to resolve Plaintiff's underlying claims against the Diocese, then the interests of judicial efficiency would counsel in favor of resolution of the bankruptcy issues prior to any complicated parish-based litigation.

Fifth, there is the issue of time. The present claims date back over 50 years. The Court is hard-pressed to find that there is any new or additional harm in continuing proceedings in favor of the bankruptcy case. The state of the evidence is unlikely to be affected by further delay, and the claims or relief sought are unlikely to alter in the intervening time.

Sixth, the Court recognizes that there are important issues and claims to be factually developed and adjudicated in the present matter. For these reasons, the Court has not granted Defendant's motion to dismiss, but these issues are inextricably linked to the resolution of Plaintiff's claims against and remedies with the Diocese.

Based on these issues and the present posture of the case, the Court has a choice. It could allow limited discovery to go forward on the Parish organizational and authority issues as outlined in the prior section and the concerns discussed in footnote 3, or it could stay the present matter to allow the Bankruptcy proceedings to move to a point of resolution or clarity in regard to the Parish assets and to clarify the Diocese's ownership and control.

The question of a stay in this instance is in the nature of a continuance and rests within the broad discretion of the trial court. *In re Woodstock Cmty. Trust*, 2012 VT 87, ¶ 36, 192 Vt. 474. Taking these factors as discussed above into consideration along with the basic equities of the parties' positions, the Court finds that the balance favors imposing a stay on the proceedings until the Bankruptcy Court process reaches either resolution, or the parties obtain an express discharge of the related claims from the Bankruptcy Court. In so ruling, the Court has considered and finds that there is little to no harm to either Plaintiff or Defendants from such a stay. *Vermont Federation of Sportsmen's Clubs v. Birmingham*, 2020 VT 27, ¶ 10. As noted above, the underlying claims are 50 years old, any limited delay is unlikely to affect the nature or

quality of the claims and evidence or the right to any damages. Furthermore, during the stay, ownership of the primary assets that Plaintiff seeks to attach will be clarified and any subsequent effort to recover against them is likely to be more straightforward as a result.

Finally, the Court recognizes that neither Plaintiff nor Defendant requested a stay in this matter as both were focused on the motion to dismiss issues. Yet, the briefing in this matter has been sufficient to illustrate the virtues and issues with such a stay as the bankruptcy proceedings have loomed large over this action. In this respect, the Court has considered conducting a hearing on the issue of a stay and finds that such a proceeding would be unlikely to alter the essential landscape against which the Court has rendered it decision.

## **ORDER**

For the foregoing reasons, Defendants' request for judicial notice is **Denied**; their motion to dismiss is **Granted in part** and **Denied in part**. The Trust Defendants are **Dismissed** from the present litigation.

The Court will stay these proceedings consistent with this Order until the Diocese and its officers are discharged from Bankruptcy, or a plan is adopted freeing the Diocese and its officers to freely participate in this litigation, or the Bankruptcy Court issues an express discharge of claims related to the present litigation, including ownership of the Parish assets.

Electronically signed on 5/29/2026 9:36 AM pursuant to V.R.E.F. 9(d)

_____

Daniel P. Richardson
Superior Court Judge

11